May it please the court, counsel, Tom Leatherbury on behalf of Petitioner Saul Ortega and David Rogers, Jr., I'd like to address three issues, as time permits. First, the threshold issue that the Comptroller's in-house adjudication, where the Comptroller serves as prosecutor and judge, violated Petitioner's Seventh Amendment right to a jury trial under the Supreme Court's jargousy opinion and under this Court's jargousy opinion and AT&T opinion. I'll try to adapt on the fly and not repeat too much of what Mr. Snyder said because the arguments are very similar. Second, that the applicable five-year statute of limitations, 28 U.S.C. 2462, bars the Comptroller's claims against Petitioner's when the charges were not filed until September 2017 and the alleged misconduct took place long before September 2012. Third, the Comptroller's wrongful reversal of the ALJ's conclusion that neither Petitioner should be banned from the banking industry because of the capital-raised loans. That's the only remaining prohibition claim that the Comptroller presses. Before turning to the Seventh Amendment, I do want to call the Court's attention to the oral argument handout that we sent in on Friday and we brought it down hard copies today. It's a little thin volume with blue covers. It has four items in it. The first is the statute of limitations. The second is the prohibition or ban on further participation in banking statute. That's 1818E. The third is the civil monetary penalty statute, which is 1818I. And fourth is excerpts from the notice of charges filed against Petitioner's in September of 2017, eight years after the capital-raised loans were made, showing that the Comptroller had a complete and present cause of action long before September 2012. So let me turn to the Seventh Amendment violation, the unconstitutional denial of a jury trial in this proceeding. The Comptroller's final decision should be vacated and the charges dismissed because Petitioners are entitled to a jury trial. Our best cases are the Supreme Court's Jharkhasi decision and this Court's decisions in Jharkhasi and AT&T. The Comptroller attempts to blunt the Seventh Amendment violation by conceding that the claims for civil monetary penalties implicate the Seventh Amendment and by deflecting the Court with arguments about the public rights doctrine and Petitioner's alleged waiver of this constitutional objection. The Comptroller is wrong on both counts. Despite the Comptroller's concession, it's worthwhile reviewing the parallels between this case in Jharkhasi and AT&T to emphasize the constitutional violation here. In the Court's Seventh Amendment analytical framework, the Court looks at the remedies sought and the causes of action alleged. Both of these factors show that the Comptroller's claims are legal claims that belong in front of a jury. The remedies under 1818I are civil monetary penalties, just as penalties were sought in Jharkhasi and AT&T. The fact that penalties were a remedy in Jharkhasi and AT&T was all but dispositive in the words of the Court in Jharkhasi and this Court quoting in AT&T that these claims belong in front of a jury. And the prohibition sought under 1818E, the ban on banking, is also a penalty, a legal remedy, according to the Ninth Circuit in De La Fuente and the D.C. Circuit in Profit. But even if these are mixed legal and equitable remedies that are involved, a jury is still required under this Court's opinion in Jharkhasi, which relied on the U.S. Supreme Court's opinion in Ross against Bernard going back to 1970. Three additional factors underscore the legal nature of the remedy the Comptroller seeks. First, the punitive nature of the remedy. These are designed to punish and to deter, not to seek restitution or remediation. So I'll adopt my friend Mr. Snyder's arguments about the disconnect between the remedy and any connection to the public funds or the public insurance. These are punitive. These are not restitutional. Second, any civil monetary penalties are payable to the Treasury, just as in Jharkhasi and AT&T they were payable to the government. And third, the penalties and the degree of penalty, those are both based on tiers of culpability, just as in Jharkhasi and in AT&T. And juries decide tiers of culpability, negligence, recklessness, et cetera, day in and day out, every day. So the remedies are all legal in nature. Turning to the claims or causes of action, the close resemblance of the Comptroller's statutory claims to common law claims of fraud, negligence, and breach of fiduciary duty reinforces petitioner's right to a jury trial. The Comptroller alleges fraud, just as the SEC did in Jharkhasi. You can see that at CL-194, which is the final decision of the Comptroller, at 85 for a taste of the common law fraud language that the Comptroller uses. Second, the Comptroller alleges unsafe and unsound banking practices. That closely resembles negligence, certainly a common law claim. The Court need only compare the statutory standard in 1818 with the second restatement of torts, Section 282, as we did in our reply brief at 13. The Court can also look at the 1880 New York case, Hunn v. Carey, cited in the briefs, alleging negligence against bank trustees. The Court can also look to the Comptroller's decision, cited in footnote 78 of our brief, and this Court's 1994 decision in Connor, in which the Comptroller and the Court both characterize these unsafe and unsound banking practices as negligence. The Court will see that the Comptroller's claims against my clients in this case are much closer to common law negligence than the FCC reasonableness standard that was at issue in AT&T, and yet a panel of this Court found that sufficient to warrant a jury trial in that case. The third claim is breach of fiduciary duty, a common law claim, of course, at least when a monetary remedy is sought as it is here. Now, the Comptroller argues that this is a unique statutory scheme. They're trying to shelter, as Mr. Snyder alluded to, under whatever is left, if anything, of the Supreme Court's decision in Atlas Roofing. But the Court should reject that argument that this is some kind of novel statutory scheme, as the Courts did in Jarcozy and AT&T, or at least a novel statutory scheme that deprives petitioners of their right to a jury trial. My response on Aiken, which is also argued in our case, is on all fours with Mr. Snyder. The petitioner's arguments, we believe, that we're entitled to a jury trial are fully consistent with Aiken, because in Aiken, the government brought an enforcement action under 1818B and sought only equitable remedies. They sought a cease and desist order and restitution. They did not seek legal remedies. So Aiken simply won't bear the weight that the Comptroller puts on it, especially after the Supreme Court's opinion in Jarcozy and this Court's opinion in AT&T, and especially not here, where the Comptroller seeks clearly legal remedies, not equitable remedies. Now let me turn to the public rights exception and try to give you how I would argue that the Court should reject the public rights exception. So the Court's rejected the public rights exception in AT&T, and this Court should here, too. I think the Comptroller's public rights argument is stunning in its breadth and tone deaf, really, to Jarcozy's majority opinion and its concurrence by Justice Gorsuch. The Comptroller's public rights doctrine would indeed swallow the rule and the presumption against the application of the public rights doctrine. We know some fundamental principles about the public rights exception to the Seventh Amendment right to a jury trial. There's no textual basis for it. There's a presumption against it. The Supreme Court has given us a short list of a narrow class of cases that have historically been resolved exclusively by the executive branch—collection of revenue, customs, things such as that. That list is in Jarcozy. That list is in AT&T. Banking enforcement claims are nowhere on that list and never have been. We also know from the Court's, in Jarcozy and other cases, that the public rights exception does not apply just because the government is a party. It does not apply whenever there is an arguable public harm or public interest. Justice Gorsuch's concurrence in Jarcozy says that most clearly. It does not apply whenever there is a novel statutory regulatory scheme. That's Jarcozy at 2136. And it does not apply just because administrative proceedings in the abstract might be more efficient or less costly. Rather, courts determine the applicability of the public rights exception by referring to background legal principles, by referring to history and tradition, and especially as it existed in 1791 when the Seventh Amendment was ratified. We look for an unbroken historical pedigree of exclusive executive enforcement, and the comptroller has zero evidence to show such an unbroken historical pedigree. In 1791, we had state charter banks or private banks. We didn't have national banks. Executive enforcement here dates back only to the 1960s and increased, as those of us of a certain age will recall, only with the passage of FIREA in the aftermath of this federal savings and loan crisis in 1989 when criminal investigations were clogging the federal court system. The court should reject the comptroller's what I would call platitudes and general statements about the importance of the banking system and the public interest and even the public fist since the public fist is not related to the remedies and the claims that are issued in this case. The Supreme Court rejected many of these same platitudes in Jarcozy and said that that petitioner was entitled to a jury trial. As the court said in Jarcozy and as this court quoted in AT&T, what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled. The comptroller here is bringing legal claims, seeking legal remedies. The comptroller is asserting rights that have traditionally been asserted by private parties, by shareholders, by banks themselves, by depositors, as they were in Hunn v. Carey back in 1880. This enforcement action belonged in front of a jury and the in-house adjudication violated petitioner's rights. Finally, on the Seventh Amendment point, I want to talk about the comptroller's argument that we waived that constitutional objection. Here, our best case is Carr v. Saul, which is Justice Sotomayor's unanimous opinion for the court in the 2020s, which rejected a similar waiver argument in the Social Security benefits context. Here, petitioners filed their objection after the administrative hearing in light of this court's May 2022 opinion in Jarcozy. Both the ALJ and the comptroller rejected or denied petitioner's objection procedurally. They said it was too late, but they also denied it on the merits. They said it was futile because they had no power to impanel a jury or to give a jury trial in that forum. According to the comptroller, neither the governing rules nor the structure in 1818 provided for a jury trial. Carr v. Saul speaks directly to this. There is no issue exhaustion requirement and no waiver when the agency has no special expertise in these constitutional issues and where it would be futile to make these objections at the agency level. Carr is dispositive and there was no waiver. I've reserved five minutes for rebuttal. Thank you. We'll see you on rebuttal. Thank you. Ms. Hicks? May it please the court. My name is Hannah Hicks and I represent the comptroller of the OCC. Your Honors, this case involves serious misconduct that strikes at the core of the OCC's mission. The National Bank Act, which was signed into law by President Lincoln, created a national banking system and established the OCC to oversee it. In furtherance of the agency's mission of ensuring the safety and soundness of that system, Congress granted the OCC authority to undertake a variety of administrative enforcement actions against banking institutions and affiliated parties, such as petitioners, who are former officers and directors of First National Bank of Edinburgh, Texas, a community bank that failed in September 2013. Because petitioners cannot credibly dispute the seriousness of their misconduct or the reasonableness of the agency's decision, they raise a series of meritless constitutional, statutory, and procedural challenges to the underlying proceedings. It is worth noting that the misconduct at issue here is beyond the pale of prudent behavior. It is undisputed that at a time when the bank faced an exigent need to raise its capital ratios, petitioners furthered a scheme to raise sham regulatory capital using the bank's existing funds. Petitioners approved dozens of concessionary loans for the purchases of bank holding company stock, the proceeds of which were then re-injected into the bank as false regulatory capital. What's more, petitioners approved these loans despite knowing that the purposes stated in loan packages were demonstrably deceptive. Additionally, despite being in virtually continuous contact with the OCC and under an obligation to be fully transparent about the bank's capital raise efforts, petitioners failed to disclose the strategy to the agency, thus impeding its ability to effectively supervise the bank at a critical time. If I could turn to petitioners' constitutional challenges. The Seventh Amendment poses no independent bar to the underlying proceedings. The OCC does not dispute that the civil penalty orders implicate the Seventh Amendment. However, this is merely the beginning of the analysis. Courts must next examine whether the adjudication involves public rights and thus may be assigned to an administrative tribunal. Unlike the SEC fraud action at issue in Jargosy, which targeted the conduct of private individuals operating in a pre-existing market, regulation of the national banking system involves distinctly governmental prerogatives that may be resolved outside of Article III courts and without a jury. In First National Bank of Hartford, the Supreme Court explained that national banks are not merely private moneyed institutions but are agencies of the United States created under its laws to promote its fiscal policies. Likewise, in First National Bank of Hartford, the Supreme Court explained that national banks are not merely private corporations primarily designed for individual trade and individual profit but are public corporations created for public and national purposes. The Supreme Court has never categorically limited the public rights exception to specifically identified areas. Rather, in Jargosy, the court explained that it was not attempting to definitively explain the distinction between public and private rights. The court went on to state, however, that public rights involve matters that historically could have been adjudicated exclusively by the executive or legislative branches, even when presented in such form that the judiciary was capable of acting on them. The court further explained that a hallmark that courts look to in determining whether a suit involves private rights is whether it is made up of the stuff of traditional actions at common law tried by the courts of Westminster in 1789. And Justice Gorsuch, in his concurrence in Jargosy, as my friend noted, explained that a common feature among traditionally recognized public rights is that they have a historical and unbroken, a serious and unbroken historical pedigree. Judicial construction surrounding the national banking system demonstrates that there is such a pedigree, reflecting that actions that implicate national banks carry no common law soil. In Davis v. Elmira Savings Bank, the Supreme Court explained that it is axiomatic that national banks are federal instrumentalities created for public purposes and that Congress, having the authority to create a system of national banks, has exclusive control over the regulation of the affairs of such banks. And in 1873, in Tiffany v. First National Bank of Missouri, the Supreme Court explained that national banks were created to serve the dual purposes of establishing a national currency and to create a market for the loans of the general government. Two years later, in 1875, in Farmers and Mechanics National Bank v. Deering, the Supreme Court described national banks as instruments designed to be used to aid the government in the administration of an important branch of the public service. In this Court's recent decision in AT&T v. FCC, this Court rejected an argument that the public implicated common carriers. In doing so, this Court explained that the common carrier doctrine is deeply rooted in the common law. In contrast, since the 19th century, courts have expressly recognized that actions that implicate national banks are not indictable at common law. For example, in 1880, in Commonwealth x-relatory v. Kettner, the Supreme Court of Pennsylvania overturned a national bank. In doing so, the Court reasoned that prior to the passage of the National Bank Act, there were no national banks, nor even a law to authorize their creation. Thus, a claim that the defendant misused funds at a national bank was not a common law offense. In 1903, the United States Supreme Court approvingly quoted Kettner at length in its Easton v. Iowa, which held that an Iowa law punishing the offense of receiving deposits at a time of national bank insolvency was preempted by federal law. The Easton Court again reasoned that Congress has sole and exclusive authority over the affairs of national banks. Six years later, in 1909, the Supreme Court issued its decision in Oceanic Steam, which is one of the public rights decisions examined in jarczy. The Oceanic Steam Court observed that its holding was in accordance with settled judicial precedent, not only as to tariff, but as to internal revenue, taxation, and other subjects. The Oceanic Steam Court reasoned that there are some areas, such as immigration, that are so fully within the of Congress that there can be no serious room to question Congress's authority to empower administrative officials acting within those spheres with the authority to impose civil penalties. Regulation of the national banking system is such an area where there can be no serious room to question Congress's plenary authority. In CFTC v. Schor, the Supreme Court held that the CFTC's exercise of jurisdiction over a state common law counterclaim did not violate Article III, where the exercise of jurisdiction involved a narrow class of common law claims in a particularized area of law governed by a strictly limited federal regulatory scheme over which the agency had obvious expertise. The same can be said of Section 1818 actions and regulation of the national banking system by the federal banking agencies. Relatedly, in Crowell v. Benson, the Supreme Court observed that there are some areas that are particularly well suited to examination and determination by an administrative agency specifically designed to that task. As the Supreme Court noted in Fahy v. Maloney, banking is one of the longest regulated and most closely supervised of public callings. Determination by an Article III court in the first instance of matters involving national bank regulation risked fragmentation and disruption of this finely-tuned system. Indeed, Congress, through the comprehensive judicial review procedures set forth at Section 1818 H and I, which were discussed in the previous argument, recognized the unique expertise of federal banking agencies, and this jurisdiction stripping language evinces an understanding that the federal banking agencies should be empowered to take administrative action to prevent systemic collapse. Accepting Petitioner's argument here risks seriously jeopardizing a critical tool that the federal banking agencies and the OCC use in ensuring public confidence in the national banking system, which today consists of approximately 1,040 institutions overseeing $16 trillion in assets and nearly 75% of U.S. credit card balances. Indeed, Congress has on multiple occasions expanded the federal banking agency's authority to impose civil penalties in response to banking crises, failures, and runs. Examples of this include the passage of the Glass-Steagall Act in 1933, which was enacted in response to the Great Depression, and the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, which as my colleague noted was enacted in response to the savings and loan crisis. This further demonstrates that the purposes underlying the instant action, which again involve core banking functions such as capital risk management and the filing of call reports, serve to vindicate the public's interest in a safe and sound banking system rather than any private right that might be recognized at common law. The OCC's position on Aiken's controlling nature here is on all fours with Mr. Brooks's arguments in connection with Burgess. I will just reiterate, as he has already explained very well, that regardless of whether the claim was legal or equitable in Burgess, this court—I'm sorry, was legal or equitable—this court in Aiken held the public rights exception applied. It is simply immaterial that Aiken involved a cease and desist action. Whether a claim is legal or equitable is not part of the public rights inquiry, but is part of the Seventh Amendment inquiry. And to briefly touch on the issue of waiver, um, the petitioners demanded a jury trial for the first time four months after the administrative hearing had been held and over a year after the deadline for dispositive motions. The OCC's practice and procedure regulations impose an issue exhaustion requirement. That's at 12 CFR 19.37. And as the Carr Court discusses in the context of adversarial proceedings such as what we have here, um, they particularly demonstrate the need for full briefing of even constitutional issues. I could turn to the statute of limitations issue briefly. The action against petitioners is not time barred. 28 U.S.C. 2462 requires that the agency commence proceedings within five years of the date that a claim first accrued. As the Supreme Court recently reiterated in Corner Post, a claim accrues at the time that a plaintiff has a complete and present cause of action. That is, when all elements have been met and can be pledged. A plain reading of 12 U.S.C. sections 1818 E and I demonstrates that the action against petitioners was timely commenced. For purposes of section 1818 E prohibitions, there are three elements, misconduct, effect, and culpability. As relevant, the effect element can be satisfied upon showing that by reason of the misconduct, the bank has suffered or will probably suffer financial loss or other damage. For purposes of section 1818 I second tier civil money penalty actions, there are two elements, misconduct and effect. And the effect element may be satisfied by showing either that the misconduct is part of a pattern or practice or that the misconduct causes or is likely to cause more than minimal financial loss to the depository institution. Here, the notice of charges initiating the instant action was filed on September 25, 2017. Therefore, any claim that accrued on or after September 25, 2012 is timely. The prohibition and second tier civil money penalties against petitioners accrued at the time that the effect element was satisfied. For purposes of the lending-related misconduct associated with the capital raise strategy, it is undisputed that the earliest alleged financial loss occurred in June 2013, a date that is within five years of the date of the filing of the notice of charges. For purposes of the second tier civil penalty accounting-related charges against Petitioner Ortega, the actionable effect is that the misconduct was part of a pattern or practice. Petitioner Ortega signed materially inaccurate call reports until the time of the bank's failure in September 2013, which again is within five years of the date of the filing of the notice of charges. The Comptroller's interpretation of the statute of limitations is consistent with the D.C. Circuit's decisions in Profitt and Blanton. The D.C. Circuit is the only circuit to have given meaningful consideration to the banking agency's interpretations of the statute of limitations. And the decisions in Profitt and Blanton represent the best reading of the relevant statutes. What about the fact that 28 U.S.C. 2462 starts or says that the cause of action accrues, well, let me rephrase. Here's the language I'm focusing on. Commenced within five years from the date when the claim first accrued. These are the words first. What effect does that have on your interpretation of the statute of limitations and when it accrues? Your Honor, I believe that Profitt is particularly instructive as to this point. Profitt also interpreted 2462 as it's applied to Section 1818 actions. And in holding that the same misconduct can produce different effects at different times, resulting in separate claims and separate accruals, the Profitt Court reasoned that separate accrual for each alternative effect gives meaning to all of the statutory language. Profitt is consistent with the should to the fullest extent possible give meaning to every word that Congress uses in a statute. Well, your position is that when the bank went under in June of 2013, that that started five years? No, Your Honor. For purposes of the capital raise strategy lending related charges, it's the agency's position that the claim first accrued when the bank sustained a loss on June 12, 2013, in connection with the capital raise strategy loans. And for purposes of the accounting related conduct, it is the filing of materially inaccurate call reports. And each instance of the filing of a materially inaccurate, materially inaccurate call report. Your position that the five years started June of 13? Yes, Your Honor, for purposes of the capital raise strategy lending related charges. And I would also like to note that Gabelli, which petitioners rely on heavily, is an opposite for two reasons. First, the fraud discovery rule is not an issue in this case. And second, Gabelli does not address the situation where, as here, the underlying statute contains an effect element that must be satisfied separately from the violative misconduct in order for the claim to accrue and the agency to bring charges. And that effect element can be satisfied through the showing of any one of multiple alternative predicates that could occur at different points in time. I want to come back to the first accrual. I understand you're saying that separate accrual for each alternative effect gives meaning to all of the statutory language, but how do you reconcile that with the language that the clock begins running on the first accrual? I think Section 2462 must be read in connection with the underlying statutory cause of action. And here, our statutory cause of action contains an effect element that must be satisfied in order for the agency to bring its claim. And this is another point that might be relevant to your Honor's question. To the extent that this court is concerned about the duration of the statute of limitations at issue here, that is a policy question that is best addressed by Congress. It's the agency's responsibility to execute its enforcement actions pursuant to the plain language of the statute, and that is exactly what the OCC did here. It's also worth noting that, as the Profit Court observed, requiring the banking agencies to speculate as to when a bank will probably suffer financial loss or other damage or risk forfeiting an enforcement action altogether imposes difficult quantification issues that may result in the banking agencies losing cases at an early stage in the process. And this problem is something that Congress expressly sought to resolve with its passage of the Financial Institutions Reform, Recovery, and Enforcement Act, which provides the basis for this action and, again, was passed in response to the savings and loan crisis. I see that my time is running out. Unless there are further questions from the panel, the OCC respectfully submits that the final decision was entered in accordance with law and supported by substantial record evidence, and the Comptroller respectfully asks this Court to deny the petition. Thank you. May it please the Court and Counsel. Judge Ramirez, I want to go right to your question. They can't reconcile their construction of 2462 with the text, first accrued. They just simply can't. They leave it out of their description of accrual in the summary of the argument at page 38 of their brief, and I want to call the Court's particular attention to what I pretty outlandish footnote, footnote 10 on page 53 of the Comptroller's brief, because if you read footnote 10, a claim can accrue for the first time many times. There are many first accruals in the Comptroller's world, and it simply is impermissible claim splitting. This is a tort case, and the Court decided Gideon against Johns Manville in 1985. The same principles apply here. You can't give an asbestos victim, you can't let them file one case when they develop asbestosis and then wait and file another case if they develop a cancer or a more serious disease from their exposure to asbestos. Gideon against Johns Manville is in our brief. That's exactly what the Comptroller wants to do with this statute. It wants to read the word first out of the statute. The Comptroller had a complete and present cause of action for the capital-raised loans when those loans were made in 2009. They were three years too late. I have a question for you, too. Yes. Yes, Your Honor. What about the fact that the petitioners explicitly represented to the OCC that no lending activity was occurring when they were making these loans, and the record reflects that the stated basis for the loans was not actually accurate. So what effect does a petitioner's actions have on the accrual here? I think that goes to accrual of a complete and present cause of action when the loans were made, Your Honor. If the loan purposes were allegedly misstated, the government had full access to the bank's records. They did a report of examination every year. If you read Judge Silberman's dissent in profit, which we think gets the law right on first accrual rather than the majority opinion, the government has a very low threshold. It doesn't have to show an actual loss. It can show these other levels of culpability that are highlighted in our bench book under 18E and 18I. And Gabelli is completely accurate and applicable. It was decided 13 years after the D.C. Circuit's decision in profit. This Court's 1985 decision in Coral Laboratories is also instructive about accrual of the complete and present cause of action when the misconduct allegedly occurred. The Ninth Circuit's De La Fuente decision is on point, and as I said, Judge Silberman's dissent in profit. To avoid the limitations bar, what the comptroller is saying is he can pick and choose which effect he wants to sue on. He may have a complete and present cause of action, but he says he can just ignore it and wait and choose a later effect. That's completely outside the first accrual language of 2462. Let me just address very briefly the Seventh Amendment arguments. Nothing from the comptroller in argument moved the needle to make this case fall into the public rights exception. By analogy, I would think the government is in a little bit of the same position as I felt I was in when this Court appointed me to represent a client, pro bono, to ask the Court to create a new Bivens cause of action, when the Supreme Court had not yet created that kind of Bivens cause of action. They're asking this Court to expand the public rights doctrine, and I think the Court should reject that invitation. On culpability, I didn't really get to that, and I apologize for that. I would commend to the Court the administrative law judge's decision, particularly at pages 120 to 131 in the evidence that she cited there, when she decided that neither petitioner should be banned from banking because of the capital loans. Thank you, Your Honors. If there are no further questions, we appreciate the Court's consideration. Thank you. Your arguments have been submitted.